IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
_____
                               )
SHANNON WIGENT,                )
                               )
          Plaintiff,           )
                               )
     vs.                       )   Civ. No. 13-00123 ACK-KSC
                               )
SCIENCE APPLICATIONS           )
INTERNATIONAL CORP.; JOHN      )
DOES 1-10; JANE DOES 1-10;     )
and DOE ENTITIES 1-10,         )
                               )
          Defendants.          )
_____)
```

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PROCEDURAL BACKGROUND

On February 7, 2013, Plaintiff Shannon Wigent ("Plaintiff") filed a Complaint against Science Applications International Corporation, now known as Leidos Holdings, Inc. ("Leidos" or "Defendant"), in the Circuit Court of the First Circuit, State of Hawaii. (Doc. No. 1 ("Notice of Removal") Ex. A.) On March 13, 2013, Leidos removed the case to this Court pursuant to 28 U.S.C. §§ 1332 and 1441. (Notice of Removal at ¶ 4.) On March 20, 2013, Leidos filed an Answer to Plaintiff's Complaint. (Doc. No. 5.)

Plaintiff's Complaint pleads claims arising out of her termination of employment from Leidos. Plaintiff's first

claim alleges that Leidos discriminated against her on the basis of her marital status in violation of Hawaii Revised Statute ("H.R.S.") § 378-2(1). (Compl. at ¶¶ 31-36.) Plaintiff also brings retaliation claims, pursuant to H.R.S. 378-2(2). (Id. at ¶¶ 37-40, 42-46.)

Leidos filed the instant Motion for Summary Judgment ("Motion" or "Mot.") along with a Concise Statement of Facts ("Def.'s CSF") on February 18, 2014, seeking summary judgment as to all the claims asserted by Plaintiff. (Doc. Nos. 48-49.) On February 20, 2014, Leidos filed an Errata in order to correct Exhibit 1 of its Concise Statement of Facts. (Doc. No. 51.) In the original Exhibit 1, Leidos omitted the first half of Exhibit 1 and uploaded the second half twice. (Id.) A complete copy of Exhibit 1 is attached to the Errata. (Id.) On March 26, 2014, Plaintiff filed her Opposition to Defendant's Motion ("Opp.") along with a Concise Statement of Facts ("Pl.'s CSF"). (Doc. Nos. 54-55.)[1] Leidos filed a Reply ("Reply") on April 7, 2014. (Doc. No. 57.) Also on April 7, 2014, Leidos filed objections and a

_____

[1]Plaintiff violated the Local Rules by attaching her fifteen exhibits to her Memorandum in Opposition rather than to her CSF. See D. Haw. Local Rule 56.1(h) ("Affidavits or declarations setting forth facts and/or authenticating exhibits, as well as exhibits themselves, shall only be attached to the concise statement."). Although her exhibits were not attached to her CSF, Plaintiff submitted a Declaration of Counsel authenticating Exhibits "A" to "L" and her own declaration authenticating Exhibits "M" to "O." (See Doc. No. 55.) Accordingly, the Court will consider Plaintiff's exhibits notwithstanding her failure to comply with the Local Rules.

response to Plaintiff's Concise Statement of Facts ("Def.'s Obj.'s"). (Doc. No. 58.)

The Court held a hearing regarding Defendant's Motion on April 21, 2014. (Doc. No. 62.)

**FACTUAL BACKGROUND**[2/]

**A.    Background on Leidos, Formerly Known as SAIC**

Prior to September 27, 2013, Leidos was known as Science Applications International Corporation ("SAIC"). (Def.'s CSF at 2, ¶ 1; Pl.'s CSF at 1, ¶ 1.) The original SAIC was a scientific, engineering and technology applications company that served commercial and government customers. (Id.) On September 27, 2013, SAIC changed its name to Leidos and spun off a separate new corporation, which kept the name SAIC. (Declaration of Jim Murray ("Murray Decl.") ¶ 5.) The divisions which Plaintiff and her husband (collectively "the Wigents") worked for remained under Leidos. (Id.)

In 2002, Leidos[3/] was awarded a federal government contract, the Maritime Synthetic Range ("MSR"), to be integrated on the island of Kauai, State of Hawaii. (Def.'s CSF at 3, ¶ 3;

_____

[2/]The facts as recited in this Order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings.

[3/]For purposes of this Order, and in accordance with the company name change, the Court will refer to the original SAIC as "Leidos."

Pl.'s CSF at 1, ¶ 3.) In 2005, as a follow-up to the MSR program,
the Pacific Region Integrated Test and Evaluation Capability
("PRITEC") program was awarded to Leidos. (Def.'s CSF at 3, ¶ 4;
Pl.'s CSF at 1, ¶ 4.) The PRITEC project lasted for several years
and ended in 2011 when federal funding ceased. (<u>Id.</u>)

### B.   **Plaintiff and Her Husband Begin Working at Leidos**

Leidos hired Plaintiff as a Systems Engineer in
October 2001. (Def.'s CSF Ex. 1 ("Pl.'s Dep.") 20:10-23.)
Plaintiff began working at the company's Virginia office. (<u>Id.</u>)
In March 2002, Plaintiff was transferred to Kauai to help
implement the MSR program. (Def.'s CSF at 3, ¶ 5; Pl.'s CSF at 1,
¶ 5.)

Leidos hired Plaintiff's husband, Mark Wigent
("Mark"), in February 2002, also as a Systems Engineer to help
implement a separate program located on Kauai. (Pl.'s Dep. 27:8-
16.) On March 16, 2002, Leidos relocated Plaintiff and her
husband from Virginia to Kauai. (Def.'s CSF at 3, ¶ 7; Pl.'s CSF
at 1, ¶ 7.)

Plaintiff concedes that her husband was initially hired
to implement a separate program on Kauai. (Pl.'s Dep. 27:8-16.)
Plaintiff asserts, however, that by November 2002, both her and
her husband had started working on the MSR program. (Decl. of Pl.
¶ 8.) Leidos contends that the Wigents only began working on the
MSR program together in late 2004. (Def.'s CSF at 4, ¶ 9.)

## C.   SH-2 Policy Adopted

In 2004, Leidos adopted Staffing Policy SH-2 ("SH-2").
(Id. at 3, ¶ 8; Pl.'s CSF at 1, ¶ 8.) The purpose of SH-2 is to

> [e]nsure that a supervisor or manager does
> not have closely related individuals (such as
> a spouse, domestic partner, person involved
> in a dating relationship, children,
> stepchildren, parents, in-laws, or siblings)
> under his or her direct or indirect
> supervision in order to prevent potential
> conflicts of interest and/or allegations of
> favoritism or sexual harassment.

(Pl.'s Dep. Ex. 2.) Section 3.6.1 of SH-2 defines the terms
"direct supervision" and "indirect supervision" as follows:

> **Direct supervision** Includes any of the
> following responsibilities: assigning work,
> conducting performance or salary reviews,
> approving timecards or expense reports, or
> making recommendations affecting the person's
> employment, compensation, or retention.

> **Indirect supervision** Having program
> management, profit and loss (P&L), or
> budgetary responsibility for the affected
> group, business unit, or organization.

(Id.)

## D.   2005 Assessment

In late 2004, Plaintiff was working with the MSR
program under division 1548, and Mark, under division 1805,
became the Program Manager ("PM") for the MSR program. (Def.'s
CSF at 4, ¶ 9; Pl.'s CSF at 1, ¶ 9.) As the PM, Mark's
responsibilities included managing the people assigned to the
MSR, interfacing with the customer, ensuring customer

satisfaction, and ensuring the program remained within budget and on schedule. (Id.)

Mark's supervisor, Steven Karwoski, in late 2004 raised the issue of whether the working relationship between Plaintiff and her husband violated SH-2 because Plaintiff was working on the MSR program while Mark was the Project Manager. (Id.) As a result, in January 2005, an assessment of whether the Wigents' working relationship violated SH-2 was administered. (Def.'s CSF at 4, ¶ 11; Pl.'s CSF at 1, ¶ 11.) The assessment was conducted by Karwoski, Leidos' Human Resources Senior Vice President Marjorie Bailey, and Plaintiff's division supervisor Sam Mudrak. (Decl. of Murray ¶ 13.)

Ultimately, Leidos did not find a violation of SH-2 policy because the Wigents, Karwoski, Bailey, and Mudrak agreed upon a "MSR Organizational Structure" plan in which Plaintiff was to become a program consultant to the MSR program. (Pl.'s Dep. 65:5-66:14 & Ex. 5; Def.'s CSF Exs. 3-4.) Under the MSR Organizational Structure plan, Plaintiff would also not receive work assignments from her husband, and she would work in future program development, rather than current project execution. (Pl.'s Dep. Ex. 5.) Although the Wigents' supervisors and Leidos' Human Resources representative approved the plan, they stated that "[i]f the business circumstances change, we will need to revisit the issue." (Def.'s CSF Exs. 3-4.)

From 2005 to 2008, Plaintiff and her husband continued to work on the same project but in separate divisions and under different management chains. (Def.'s CSF at 4, ¶ 14; Pl.'s CSF at 1, ¶ 14.) During this time, Plaintiff also worked on a project that her husband was not assigned to: the Unmanned Test Bed. (Pl.'s Dep. 39:24-40:9, 56:22-24.)

### E. 2008 and 2009 Assessments

In 2007, Plaintiff began working on the PRITEC project where her husband was the PM. (Def.'s CSF at 5, ¶ 15; Pl.'s CSF at 1, ¶ 15.) On October 29, 2008, Leidos conducted an assessment of Plaintiff and her husband's working relationship. (Pl.'s Dep. Ex. 6; Pl.'s CSF Ex. M.) The assessment report was prepared by Mudrak, Plaintiff's division supervisor, and sent to Iva Heflin (Leidos' Human Resources Manager) and Reed Heddleston (Leidos' Operations Manager). (Id.)

In the October 2008 assessment report, Mudrak found that the Wigents' working relationship did not violate SH-2 because there was no direct or indirect supervisory relationship between Plaintiff and her husband, as defined by SH-2. (Id.) Specifically, Mudrak found that there was no direct supervisory relationship because (1) Plaintiff was a consultant on PRITEC and did "not receive specific tasking or work under direct supervision from Mark";(2) Plaintiff's role on PRITEC was, "by its very nature, independent of the program execution work being

directed by Mark"; (3) Mark did "not direct or provide any inputs" to Plaintiff's assignments or reviews; and (4) on all non-PRITEC projects, Plaintiff had no "programmatic link" to the work her husband was doing. (Id.) Mudrak further determined that there was no indirect supervisory relationship because "[w]hile Mark is the PM on PRITEC[,] he has no responsibilities that impact [Plaintiff] within Division[] 1548. . . All indirect matters regarding [Plaintiff] are dealt with by [Plaintiff's immediate supervisor] or me." (Id.)

Accordingly, Mudrak concluded that there was "<u>no direct supervision and no indirect supervision</u> issues regarding Policy SH-2 that are applicable to the particular situation." (Id.) (emphasis in original.) Mudrak further stated that he "will make certain that position and role assignments in the future are carefully reviewed" in the context of SH-2, prior to any changes to the Wigents' work assignments. (Id.)

On November 30, 2009, Mudrak completed an additional assessment report on whether the Wigents' working relationship violated SH-2. (Def.'s CSF Ex. 5.) The results of the assessment report were sent to Heddleston and Angela Marquez, Leidos' Human Resources Manager. (Id.) For virtually the same reasons as those listed in the 2008 assessment report, Mudrak found that there was no violation of the SH-2 policy because there was no direct or indirect supervisory relationship between Plaintiff and her

husband. (Id.)

Consequently, Plaintiff continued to work on PRITEC and another project from 2007 through 2010, both with her husband as PM. (Def.'s CSF at 5, ¶ 18; Pl.'s CSF at 2, ¶ 18.) Plaintiff was considered a consultant to those projects, not subject to the direction of the PM. (Id.) Her work on Mark's projects included: external customer interface and demonstrations; creating and keeping program documentation; and assisting the customer with any documentation they may need for annual reports or briefings. (Id.)

Plaintiff asserts that the 2008 and 2009 reports only focus on the structural separation between the two divisions in which she and her husband worked, and do not place any significance in the amount of time she spent on a project in which her husband was the PM. (Decl. of Pl. ¶¶ 20-21.) Plaintiff states that around the time Leidos performed the 2008 and 2009 assessments, she charged at least ninety percent of her time to Mark's PRITEC project. (Id. ¶¶ 21-22.) Leidos admits that "from 2008 to her removal from the PRITEC contract in 2011, Plaintiff charged 90 - 100 % of her time to projects in which Mark Wigent was the Project Manager." (Pl.'s CSF Ex. H at 4-5.)

### F. 2011 Assessment

From January to mid-March 2011, Leidos conducted an assessment of the working relationship between Plaintiff and her

husband. (Def.'s CSF Ex. 7.) The investigation into the Wigents'

working relationship was triggered by Edwin Foreman, Mark's

division manager, who questioned Mark's submission of a budget

proposal for a project called "EQDR." (Id. Ex. 6.) Leidos

contends that "Mark included Plaintiff on a staffing plan for the

PRITEC program" and, as a result, Foreman reported to HR a

potential violation of SH-2. (Def.'s CSF at 5, ¶ 19.) According

to Plaintiff, her name had been placed on the EQDR proposal to

merely represent the need in the budget for a systems engineer.

(Decl. of Pl. ¶ 30.)[4/] In other words, Plaintiff asserts that her

_____

[4/]Leidos objects to Plaintiff's statement in her declaration
that her name had been placed on the EQDR proposal to merely
represent the need in the budget for a systems engineer as being
self-serving and uncorroborated. (Def.'s Obj.'s at 3, ¶ 19.)
Citing Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061
(9th Cir. 2002), Leidos makes similar objections to numerous
other statements in Plaintiff's declaration and her and her
husband's depositions. (Reply at 1-2.) In Villiarimo, the Ninth
Circuit held that it "has refused to find a 'genuine issue' where
the only evidence presented is 'uncorroborated and self-serving'
testimony." Villiarimo, 281 F.3d at 1061. However, in S.E.C. v.
Phan, 500 F.3d 895, 909-10 (9th Cir. 2007), the Ninth Circuit
explained that the declaration in Villiarimo "included facts
beyond the declarant's personal knowledge and 'provided no
indication how she knows these facts to be true.'" Id. (citing
Villiarimo, 281 F.3d at 1059 & n. 5, 1061) (alterations omitted).
Citing United States v. Shumway, 199 F.3d 1093, 1104 (9th Cir.
1999), the Phan court further held that

> [i]n most cases, consequently, that an
> affidavit is selfserving bears on its
> credibility, not on its cognizability for
> purposes of establishing a genuine issue of
> material fact. Only in certain instances –
> such as when a declaration states only
> conclusions, and not such facts as would be
> admissible in [continued on next page]

name was a "placeholder" and that the placement of her name on the proposal did not mean that she would be assigned work on the project. (Id.) Plaintiff further asserts that the amount of work her husband allocated on the EQDR proposal for the particular systems engineer represented by her name was approximately five percent of the total budget for the project. (Id.)

The 2011 assessment report was prepared by Jim Murray (Leidos' Vice President of Human Resources), Foreman, and Sergio Nirenberg (Plaintiff's supervisor). (Def.'s CSF Ex. 7.) The report provides, in relevant part:

> **Background.** During a recent proposal effort (EQDR), Mark, as the Program Manager, included [Plaintiff] in the staffing plan which raised concerns about a potential conflict with the SH-2 policy. This concern was raised by Division Manager Ed Foreman. Given the recent SAIC reorganization and the concerns raised by Ed Foreman, a reassessment of the possible nepotism issues regarding the

---

evidence, – can a court disregard a selfserving declaration for purposes of summary judgment.

Phan, 500 F.3d at 909 (citing Shumway, 199 F.3d at 1104) (internal quotation marks and alterations omitted).

Pursuant to Phan, this Court can consider Plaintiff's statement that her name was a "placeholder" on the EQDR proposal because she provides detailed facts in support, and her statement is based on personal knowledge. Regarding Leidos' numerous other objections, the Court will address a specific objection if the Court relies on disputed statements in Plaintiff's declaration (or her and her husband's depositions) when making its summary judgment determinations.

relationship between [Plaintiff] & Mark is
recommended to ensure compliance with SAIC
policy SH-2 and to 'prevent potential
conflicts of interest and/or allegations of
favoritism or sexual harassment.'

[Plaintiff] and Mark Wigent are married.
. . .

**Direct Supervision Discussion.** Although
Mark's responsibilities do not include
conducting [Plaintiff's] performance or
salary reviews, approving her timecards or
expense reports, he does manage the overall
work of the program, he may be assigning work
to [Plaintiff] and he may affect
[Plaintiff's] employment if there was a
funding reduction on the program.

**Indirect Supervision Discussion.** Mark has
overall Program Management responsibility
over the programs that [Plaintiff] works. All
of [Plaintiff's] work is in support of two
programs on which Mark is the PM (PRITEC and
DCDS). In previous SH-2 assessments,
[Plaintiff] was working under TENA and not
exclusively under PRITEC. The policy lists
'program management' as an indirect
supervision area.

**Conclusion:** It is management and HR's
conclusion that there is a violation of SH-2
in the area of <u>indirect supervision</u> and
potentially in the area of <u>direct</u>
<u>supervision</u>. Management, in conjunction with
HR, needs to address the working relationship
to comply with the SH-2 policy.

(<u>Id.</u>) (emphasis in original).

Leidos contends that the 2011 assessment revealed that

Plaintiff's involvement on her husband's projects "was more

extensive than was previously realized." (Def.'s CSF at 5, ¶ 20.)

Plaintiff asserts that Leidos' HR personnel, the divisions, and

the division managers were "fully aware of the extent to which Plaintiff worked on Mark's projects." (Pl.'s CSF at 2, ¶ 20.) Plaintiff further asserts that there had been no changes to the Wigents' working relationship, the structure established by Leidos to comply with SH-2, or the nature of the Wigents' work since the previous 2005, 2008 and 2009 assessments. (Decl. of Pl. ¶ 32.)

Following the 2011 assessment report, Leidos' supervisors and HR discussed various alternatives for restructuring the Wigents' jobs in order to rectify the violation of SH-2. (Def.'s CSF at 6, ¶ 22; Pl.'s CSF at 2, ¶ 22.) On March 28, 2011, via teleconference, the Wigents, Foreman, Roger Medd (Mark's immediate supervisor), Nirenberg, Alicia Larosa-Lowe (Leidos' Senior Human Resources Generalist), and Murray discussed the best course of action to avoid a direct or indirect supervisory relationship. (Def.'s CSF Ex. 9.) Murray suggested having Plaintiff's husband step down as PM; but Mark "indicated that it didn't make sense for him to not be the PM on the project." (Id.) As a result, Leidos decided to remove Plaintiff from PRITEC effective April 5, 2011. (Id.) Nirenberg and Leidos' HR personnel stated during the March 28, 2011 teleconference meeting that they would help "redeploy" Plaintiff. (Id.)

On April 5, 2011, Plaintiff was removed from PRITEC and notified that if she was unable to find another position she

would eventually have to be laid-off from the company. (Def.'s CSF at 6, ¶ 25; Pl.'s CSF at 2, ¶ 25.)[5/] A few weeks later, on April 20, 2011, Plaintiff sent a letter to Leidos through her legal counsel stating her belief that being removed from PRITEC was unlawful and in violation of Hawaii's antidiscrimination law. (Pl.'s Dep. Ex. 10.)

### G. Asserted Attempts to Restructure Plaintiff's Employment

Leidos contends that, around April 2011, Plaintiff was asked if she would consider transferring to another location, which she declined. (Def.'s CSF at 7, ¶ 27.) Leidos further contends that in April and May 2011 Nirenberg (Plaintiff's supervisor) contacted the other program managers in his division and inquired whether there was work for her in those programs. (Def.'s CSF at 7, ¶ 28.) Nirenberg states in his declaration that due to both the location and Plaintiff not being a software developer, he was unable to find any work for her on these other programs. (Declaration of Sergio Nirenberg ("Nirenberg Decl.") ¶ 8.) Nirenberg further states that between April and August 2011 he worked with Plaintiff to respond to a proposal in which Plaintiff would have had full-time work as the systems engineer

_____

[5/]From April 5, 2011, to December 2, 2011, the official date of her separation from employment with Leidos, Plaintiff was placed on "overhead" and received the same salary and benefits as she had prior to removal from PRITEC. (Def.'s CSF at 8, ¶ 34; Pl.'s CSF at 2, ¶ 34.)

on another project; however, Leidos did not win the contract for that project. (Id. ¶ 9.)

Plaintiff disputes Leidos' contentions and asserts that "[o]ther than vaguely asking if I would be interested in working 'part-time' [Nirenberg] did not contact me about specific and available jobs." (Decl. of Pl. ¶ 58.) Plaintiff further notes that Leidos did not attempt to place her on the "redeployment list" until after she was informed of her termination of employment from Leidos on November 4, 2011. (Decl. of Murray ¶ 26.) According to Plaintiff, the "redeployment list is shared with managers and departments who are [in] need of employees currently employed but without 'coverage.'" (Id. ¶ 57.)[6/] At the April 21, 2014 hearing, Leidos conceded that the company should have placed Plaintiff on the redeployment list following her removal from PRITEC. (Rough Transcript at 46.)

Plaintiff stated during her deposition that she had access to internal job postings on the company's website in 2011, but she did not apply to any job listings on the website or discuss her resume or job options with Leidos' HR personnel. (Pl.'s Dep. 121:7-16; 135:21-138:1; 197:16-198:20.) Plaintiff further stated that she submitted an updated resume to the

---

[6/]Neither party fully explains the meaning of the phrase "without coverage." However, construing all inferences in favor of Plaintiff, it appears that a Leidos employee is "without coverage" when the employee is not assigned to any program or project but nevertheless remains employed with the company.

company website and regularly reviewed the website, but found no positions that could be performed from her home in Kauai. (Id. 139:18-141:4.)

On June 29, 2011, Nirenberg spoke with Plaintiff's husband about stepping down as PM in order to eliminate any potential violations of SH-2. (Def.'s CSF Ex. 13.) The following day, on June 30, 2011, Mark sent an email to Nirenberg stating that he declined to step down from his PM position. (Id.)

In August 2011, Nirenberg asked Plaintiff if she would consider working part-time in a marketing position. (Pl.'s Dep. 171:19-172:17; Decl. of Nirenberg ¶ 12.) On August 3, 2011, via email, Plaintiff declined the part-time offer and stated the following:

> I believe that the reason stated by SAIC for
> not permitting me to continue in my position,
> violation of Policy SH-2, is unlawful.
> Therefore, I ask that SAIC permit me to
> continue working in the position for which I
> was hired, with the same terms and
> conditions.

(Def.'s CSF Ex. 14.) Plaintiff asserts that, in response to her August 3, 2011 email, Nirenberg told her that HR was going to begin the lay-off process. (Pl.'s Dep. 172:12-17.)[7] Plaintiff

_____

[7]Leidos objects to Plaintiff's statement that Nirenberg told her that HR was going to begin the lay-off process as being self-serving and uncorroborated. (Def.'s Obj.'s at 6, ¶ 31.) However, contrary to Leidos' contention, Plaintiff's statement is somewhat corroborated by the record. Specifically, the record indicates that after Nirenberg received Plaintiff's August 3, 2011 email, he sent an email on the same day to [continued on next page]

further asserts that her husband offered to step down as PM in August 2011, but Leidos still continued with the lay-off process. (Decl. of Pl. ¶ 59.)[8/]

On November 4, 2011, Leidos issued a Notice of Lay-off to Plaintiff. (Def.'s CSF at 8, ¶ 36; Pl.'s CSF at 2, ¶ 36.) Plaintiff was given the option to terminate her employment on December 2, 2011, or take leave without pay for four extra weeks (until December 30, 2011) in order to remain covered under her benefit plans and seek any available positions within Leidos. (Def.'s CSF Ex. 15.) Plaintiff chose the first option. From November 11, 2011, to November 29, 2011, Plaintiff was placed on Leidos' redeployment lists. (Def.'s CSF at 8, ¶ 37; Pl.'s CSF at 2, ¶ 37.) Plaintiff was officially separated from employment with Leidos on December 2, 2011. (Def.'s CSF at 8, ¶ 38; Pl.'s CSF at 2, ¶ 38.)

---

Murray "suggest[ing] [that] we present her with a lay off letter with the 4 week time period starting next Monday." (Def.'s CSF Ex. 14.) Even assuming (but not finding) Exhibit 14 of Defendant's CSF does not corroborate Plaintiff's statement, the Court determines that it may still consider Plaintiff's statement because it is not conclusory and is based on her personal knowledge. See Phan, 500 F.3d at 909-10.

[8]Leidos also objects to Plaintiff's statement in her declaration that Mark proposed to step down as PM in August 2011 as being self-serving and uncorroborated. (Def.'s Obj.'s at 3, ¶¶ 23-24.) As discussed in Part II(B)(4) of the Discussion section of this Order infra, the Court finds that this allegation may not be considered because it was neither plead in the complaint nor raised administratively. Accordingly, the Court need not address Leidos' objection.

## H.    Plaintiff's Allegations of Discrimination

Plaintiff asserts that her and her husband's working relationship that Leidos claimed violated SH-2 had not only been condoned by, but created by, the company for its benefit; and that it had been approved by the company's HR department in 2005, 2008, and 2009. (Decl. of Pl. ¶¶ 25, 31-32, 41.) According to Plaintiff, Leidos applied SH-2 differently to non-married closely related employees and permitted them to continue working without penalty. (Id. ¶¶ 66-70.) Plaintiff also asserts that Plaintiff retaliated against her and her husband for complaining about the alleged marital status discrimination. (Compl. at ¶¶ 37-40, 42-46.)

On July 7, 2011, Plaintiff filed a "Pre Complaint Questionnaire" with the Hawaii Civil Rights Commission ("HCRC"). (Decl. of Pl. ¶ 46.) On September 24, 2011, Plaintiff filed a formal Charge of Discrimination with the HCRC alleging marital status discrimination and retaliation in violation of H.R.S. § 378-2. (Pl.'s Dep. Ex. 14.) After her termination, Plaintiff filed an Amended Charge of Discrimination on January 13, 2012, adding to her original charge "the fact that she has been laid-off from SAIC." (Pl.'s CSF Ex. E.)

### STANDARD

A party may move for summary judgment on any claim or

defense - or part of a claim or defense - under Federal Rule of Civil Procedure ("Rule") 56. Summary judgment "should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Maxwell v. Cnty. of San Diego</u>, 697 F.3d 941, 947 (9th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). Under Rule 56, a "party asserting that a fact cannot be or is genuinely disputed must support the assertion," either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The substantive law determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (citation omitted) (emphasis in original).

A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." United States v. Arango, 670 F.3d 988, 992 (9th Cir. 2012) (quoting Anderson, 477 U.S. at 247). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott, 550 U.S. at 380.

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. Avalos v. Baca, 596 F.3d 583, 587 (9th Cir. 2010).[9] If the moving party satisfies its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Sluimer v. Verity, Inc., 606 F.3d 584, 587 (9th Cir. 2010). The nonmoving party must present evidence of a "genuine issue for trial," Fed. R. Civ. P. 56(e), that is "significantly probative or more than merely colorable." LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1137 (9th Cir. 2009) (citation omitted). Summary judgment will be granted against a party who fails to demonstrate facts sufficient to establish "an

_____

[9]When the party moving for summary judgment would bear the burden of proof at trial, the movant must present evidence which would entitle it to a directed verdict if the evidence were to go uncontroverted at trial. Miller v. Glenn Miller Prods., 454 F.3d 975, 987 (9th Cir. 2006) (citation omitted). In contrast, when the nonmoving party would bear the burden of proof at trial, the party moving for summary judgment may meet its burden by pointing out the absence of evidence from the nonmoving party. Id. (citation omitted).

element essential to that party's case and on which that party will bear the burden of proof at trial." Parth v. Pomona Valley Hosp. Med. Ctr., 630 F.3d 794, 798-99 (9th Cir. 2010) (citation omitted).

When evaluating a motion for summary judgment, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378 (2007). The court may not, however, weigh conflicting evidence or assess credibility. In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008).[10] Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. Anderson, 477 U.S. at 250-51.

**DISCUSSION**

## I. Plaintiff's H.R.S. § 378-2(1) Marital Status Discrimination Claim

In her first claim, Plaintiff alleges that Leidos

---

[10]Nonetheless, a "conclusory, self-serving affidavit" that lacks detailed facts and supporting evidence may not create a genuine issue of material fact. F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1159 (9th Cir. 2010). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012).

discriminated against her on the basis of her marital status in violation of H.R.S. § 378-2(1). (Compl. at ¶¶ 31-36.) H.R.S. § 378-2 provides in pertinent part:

> (a) It shall be an unlawful discriminatory practice:
>
> (1) Because of. . . marital status. . .
>
> (A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]

H.R.S. § 378-1 defines "marital status" as "the state of being married or being single."

The Hawaii Supreme Court has stated that, when addressing employment discrimination claims brought under H.R.S. § 378-2, the courts look to "interpretation of analogous federal laws by the federal courts for guidance." Schefke v. Reliable Collection Agency, Ltd., 96 Haw. 408, 425 (Haw. 2001) (citing Shoppe v. Gucci America, Inc., 94 Haw. 368, 377 (Haw. 2000)). Although Title VII of the 1964 Civil Rights Act does not include "marital status" in its list of protected categories covered by the federal antidiscrimination statute, see 42 U.S.C. § 2000e-2, Hawaii courts in construing H.R.S. § 378-2 have analyzed federal court decisions involving other types of employment discrimination claims. See Shoppe, 94 Haw. at 378-81 (analyzing H.R.S. § 378-2 age discrimination claim under federal law); Sam

Teague, Ltd v. Hawaii Civil Rights Comm'n, 89 Haw. 269, 281 (Haw. 1999) (analyzing H.R.S. § 378-2 sex discrimination claim under federal law); Furukawa v. Honolulu Zoological Soc'y, 85 Haw. 7, 12-14 (Haw. 1997) (analyzing H.R.S. § 378-2 race discrimination claim under federal law). Accordingly, this Court will examine federal cases under Title VII in order to analyze Plaintiff's H.R.S. § 378-2(1) marital status discrimination claim.

The Ninth Circuit has held that a plaintiff may establish her Title VII case by "simply produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." McGinest v. GNE Service Corp., 360 F.3d 1103, 1122 (9th Cir. 2004). Direct evidence is evidence "which, if believed, proves the fact of discriminatory animus without inference or presumption." Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir. 2005). Such evidence is usually composed of "clearly sexist, racist, or similarly discriminatory statements or actions by the employer." Id. In contrast, circumstantial evidence constitutes "evidence that requires an additional inferential step to demonstrate discrimination." Id. at 1095. A plaintiff's circumstantial evidence must be both specific and substantial in order to survive summary judgment. Becerril v. Pima Cnty. Assessor's Office, 587 F.3d 1162, 1163 (9th Cir. 2009) (citing Bergene v.

-23-

Salt River Project Agr. Imp. And Power Dist., 272 F.3d 1136, 1142 (9th Cir. 2001)).

Alternatively, in order to evaluate the evidence in an orderly way, federal courts may use the burden-shifting framework of McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973), to analyze Title VII employment discrimination claims. Hawn v. Executive Jet Management, Inc., 615 F.3d 1151, 1155 (9th Cir. 2010); see Hac v. University of Hawaii, 102 Haw. 92, 101 (Haw. 2003) ("This court has adopted the McDonnell Douglas analysis in HRS § 378-2 discrimination cases.") and Schefke, 96 Haw. at 441 (adopting a three-prong test for § 378-2(1) claim and noting that it "is consistent with the McDonnell Douglas framework this court has followed in Shoppe, Sam Teague, and Furukawa"); see also Shoppe, 94 Haw. at 378-81; Sam Teague, 89 Haw. at 279; Furukawa, 85 Haw. at 12-14.

### A. Direct Evidence: Whether SH-2 is Per Se Discriminatory

Although they have differing interpretations of its impact, both parties acknowledge that the Hawaii Supreme Court's decisions in Ross v. Stouffer Hotel Co. (Hawaii) Ltd., Inc., 72 Haw. 350 (Haw. 1991) ("Ross I") and Ross v. Stouffer Hotel Co. (Hawaii) Ltd., Inc., 76 Haw. 454 (Haw. 1994) ("Ross II") (collectively "the Ross cases" or "the Ross decisions") are the leading (and only) Hawaii cases directly addressing H.R.S. § 378-2(1)'s prohibition on marital status discrimination.

-24-

In the <u>Ross</u> cases, Stouffer Hotels terminated Harvey
Ross as a massage therapist at Waiohai Resort on Kauai after
determining that his wife, the principal massage therapist and
Harvey's direct supervisor, could not work in the same department
due to the company's "no-relatives policy." <u>Ross</u>, 72 Haw. at 351.
That policy prohibited persons related by blood or marriage from
working in the same department. <u>Id.</u> With respect to married
couples, the policy stated that if the couple married "after
being employed. . . one of the two will be asked to transfer or
resign." <u>Id.</u> The Hawaii Supreme Court concluded "that as a matter
of law, the policy in question of terminating persons who marry
other persons working in the same department violates H.R.S. §
378-2 unless the termination falls within one of the exceptions
in H.R.S. § 378-3." <u>Id.</u> at 354.

Pursuant to the <u>Ross</u> decisions, it appears that SH-2
constitutes direct evidence of per se discrimination unless one
of the exceptions under H.R.S. § 378-3 applies.[11/] Like Stouffer

---

[11/]Neither party briefed whether one of the exceptions in
H.R.S. § 378-3 applies in this case. However, at the April 21,
2014 hearing, Plaintiff argued that Leidos failed to meet its
burden of establishing that one of the exceptions in H.R.S. §
378-3 apply. (Rough Transcript at 36-37.) Leidos asserted at the
hearing that SH-2 served "legitimate business purposes." (<u>Id.</u> at
5.) However, Leidos mischaracterizes the exceptions in H.R.S. §
378-3, which provides in relevant part:

Nothing in this part shall be deemed to:

(2) Prohibit or prevent the establishment and
maintenance of bona [continued on next page]

-25-

Hotels' no-relatives policy, SH-2 applies to both married couples and direct relatives. (<u>See</u> Pl.'s Dep. Ex. 2.) While Leidos notes that SH-2 also applies to employees involved in a "dating relationship" and to those related by marriage, the difference is immaterial and disregards that "spouses" are specifically included on the list of "closely related individuals" subject to scrutiny under the SH-2 policy.

Furthermore, the policy in the <u>Ross</u> cases prohibited a married couple from working in the same department. Similarly, SH-2 essentially bars married couples from working in the same program or project based on the policy's broad definition of "indirect supervision." Under the indirect supervision provision, one spouse is prohibited from working on a program or project where the other spouse has "program management, profit and loss

---

fide occupational qualifications reasonably necessary to the normal operation of a particular business. . . and that have a substantial relationship to the functions and responsibilities of prospective or continued employment;

(3) Prohibit or prevent an employer. . . from refusing to hire, refer, or discharge any individual for reasons relating to the ability of the individual to perform the work in question[.]

Here, Leidos did not address whether SH-2 is designed to maintain "bona fide occupational qualifications" or relates to the ability of its employees to perform work. Accordingly, Leidos fails to meets its burden of showing that one of the exceptions in H.R.S. § 378-3 apply in this case.

(P&L), or budgetary responsibility." (<u>Id.</u>) Moreover, SH-2 may be more restrictive in certain respects than the policy in the <u>Ross</u> cases. Stouffer Hotels' no-relatives policy applied only if the two employees married after they started working at the resort. With respect to SH-2, a married couple is subject to the policy even if - as is the case with the Wigents - they were married prior to their employment with Leidos.

Leidos' principal argument is that SH-2 "does not single out married people," but rather "focuses on the <u>nature</u> of Plaintiff's relationship as a closely related individual, and not simply on her marital status." (Def.'s Mot. at 21-22) (emphasis in original.) This very argument was made by the dissent in <u>Ross</u> II and explicitly rejected by the majority. <u>Ross</u>, 76 Haw. at 458-59. Specifically, the majority held that

> the dissent remains wedded to the notion that the definition of marital status contained in H.R.S. § 378-1 (1985) - 'the state of being married or being single' - unambiguously permits employers to discriminate against married persons so long as the discrimination is based on the 'identity and occupation of a person's spouse' . . . and not solely on the fact that he or she is married, regardless of to whom.
>
> That extremely restrictive reading of the statute ignores the simple fact of life that when a person marries, it is always to a particular person with a particular 'identity.' One does not 'marry' in some generic sense, but marries a <u>specific person</u>. Thus, the 'identity' of one's spouse (and all of his or her attributes, including his or

her occupation) is implicitly subsumed within
the definition of 'being married.' The two
cannot be separated. It makes no sense,
therefore, to conclude, as the dissent does,
that an employer who discriminates based
on the 'identity and occupation' of a
person's spouse is not also discriminating
against that person because he or
she is married. An employer can't do one
without the other. Stated otherwise, a
no-spouse policy, by definition, applies
only to the class of married persons.
Consequently, when an employer discharges
an employee pursuant to such a policy,
it necessarily discriminates 'because of. . .
[the employee's] marital status[.]'
H.R.S. § 378-2.

. . .

Granted, the 'identity and occupation' of
Ross's spouse was also a contributing cause
of his discharge. That, however, does not
diminish the fact that, but for Ross's
marital status, he would not have been fired.

Id. (emphasis in original).

The Hawaii Supreme Court's broad interpretation of

"marital status" in H.R.S. § 378-2 makes clear that the provision

protects not only an employee's status as married, but also the

"identity and occupation" of that employee's spouse. Id.

(emphasis added). Although the Ross decisions do not define the

term in detail, it appears that SH-2's "direct supervision" and

"indirect supervision" categories are similar to Ross's

"occupation." See Ross, 72 Haw. at 354 ("The problem raised by

the conflict between company policies prohibiting married persons

from working for the same company, or in the same department, or

in a supervisory/supervisee relationship. . . .") (emphasis

added). This Court's reading of Ross's "occupation" is

"consistent with the overall purpose and design of Part I of

H.R.S. Chapter 378, which. . . defines prohibited discriminatory

conduct in very broad terms and places the burden on the employer

to justify its practices." Ross, 76 Haw. at 459; see also Kraft,

Inc. v. State, 284 N.W.2d 386, 388 (Min. 1979) (relied upon by

the Ross I court and holding that marital status "embrace[s] the

identity or situation of one's spouse") (emphasis added).

The Hawaii Supreme Court in Ross II noted that

"regardless of whether we believe that our construction of the

statute amounts to good or bad public policy, we are constrained

to reaffirm the holding of Ross I." Ross, 76 Haw. at 459.

Likewise, this Court is constrained to follow the decision of the

Hawaii Supreme Court in Ross II. Accordingly, it appears that SH-

2 as applied to Plaintiff "violates the plain language and

purpose of H.R.S. § 378-2, unless the termination [or other

adverse action] falls within one of the exceptions in H.R.S. §

378-3." Id. at 459. Because there is a genuine issue of material

fact as to whether one of the exceptions in § 378-3 applies, the

Court DENIES Defendant's Motion for Summary Judgment with respect

to Plaintiff's marital status discrimination claim.

### B. Circumstantial Evidence: Whether SH-2 Was Applied in a Discriminatory Manner

The Court further concludes that Leidos' application of SH-2 to the Wigents in 2011 and Leidos' finding a violation of the policy raises a genuine issue of material fact whether they constitute circumstantial evidence that SH-2 was applied in a discriminatory manner. Specifically, the record indicates that Leidos conducted three prior assessments in 2005, 2008, and 2009, concerning whether Plaintiff and her husband's working relationship violated SH-2 and that the Wigents were never found to have violated the policy. (See Pl.'s CSF Ex. M; Pl.'s Dep. Ex. 5.) Further, the record shows that in 2005 the Wigents and Leidos agreed upon an organizational structure in which Plaintiff and her husband were placed in different divisions with separate supervisory chains of command. (Id.) Plaintiff submits evidence that the work structure agreed upon by the parties did not substantially change from 2005 to 2011, when Leidos found that the Wigents' working relationship violated SH-2. (Decl. of Pl. ¶¶ 16-37.) Plaintiff's evidence is corroborated by the 2008 and 2009 assessment reports which provide that on all non-PRITEC projects, Plaintiff had no "programmatic link" to the work her husband was doing, and, on the PRITEC project, her role was, "by its very nature, independent of the program execution work being directed by Mark." (Pl.'s CSF Ex. M; Def.'s CSF Ex. 5.)

Importantly, the 2011 assessment report stated that in previous SH-2 assessments Plaintiff was not working "exclusively"

on programs managed by her husband; and, moreover, the company admits that from 2008 to 2011 she was billing a minimum of ninety percent and up to one-hundred percent of her time on projects in which Mark was the PM. (Pl.'s EX. H. at No. 7.)

Furthermore, the 2011 assessment report stated that the investigation into the Wigents' working relationship was triggered when Mark placed Plaintiff on a budget proposal for the EQDR project. However, Leidos does not explain why the company did not simply restructure the Wigents' working relationship to avoid a SH-2 violation, as the company had previously done in 2005. Even assuming (but not finding) Leidos could not have restructured the Wigents' working relationship, the Court notes that the amount of work allocated to the systems engineer on EQDR represented only five percent of the total budget for the project. Consequently, the Court concludes that Leidos' application of SH-2 to the Wigents in 2011 and Leidos' finding a violation of the policy raises a genuine issue of material fact whether they constitute circumstantial evidence that the policy was applied in a discriminatory manner. In other words, like the Ross cases, it appears "but for" Plaintiff being married to Mark, she would not have been removed from PRITEC. See Ross, 76 Haw. at 458-59.

Accordingly, the Court DENIES Defendant's Motion for Summary Judgment with respect to Plaintiff's marital status discrimination claim.

### C. Whether Plaintiff Establishes Marital Status Discrimination Through the McDonnell Douglas Burden-Shifting Framework

#### 1. Statutory Framework

Both Plaintiff and Leidos utilize the McDonnell Douglas framework in analyzing Plaintiff's marital status discrimination claim.

For the first step in the McDonnell Douglas burden-shifting framework, Plaintiff must establish a prima facie case of employment discrimination that "gives rise to an inference of unlawful discrimination." Hawn, 615 F.3d at 1156. Plaintiff may establish a prima facie case based on circumstantial evidence by showing that (1) she belongs to a protected class, (2) she was qualified for her position, (3) she experienced an adverse employment action, and (4) similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. Id. (citing Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004)).

The Ninth Circuit has held that "the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary

judgment." <u>Chuang v. Univ. of California Davis Bd. of Trustees</u>,
225 F.3d 1115, 1124 (9th Cir. 2000). "This is because the
ultimate question is one that can only be resolved through a
searching inquiry – one that is most appropriately conducted by a
factfinder, upon a full record." <u>Id.</u> (citing <u>Schnidrig v.
Columbia Mach., Inc.</u>, 80 F.3d 1406, 1410 (9th Cir. 1996))
(internal quotation marks omitted).

If Plaintiff establishes a prima facie case, "the
burden of production, but not persuasion, then shifts to the
employer to articulate some legitimate, nondiscriminatory reason
for the challenged action." <u>Hawn</u>, 615 F.3d at 1155.

If Defendant meets this burden, then Plaintiff must
raise "a triable issue of material fact" as to whether
Defendant's proffered reasons for the adverse employment actions
are "mere pretext for unlawful discrimination." <u>Id.</u> "[A]
plaintiff's burden is much less at the prima facie stage than at
the pretext stage." <u>Id.</u> at 1158.

"A plaintiff can show pretext directly, by showing
that discrimination more likely motivated the employer, or
indirectly, by showing that the employer's explanation is
unworthy of credence." <u>Vasquez v. Cnty. of Los Angeles</u>, 349 F.3d
634, 641 (9th Cir. 2003). A plaintiff may show pretext through
presenting direct evidence, or by presenting circumstantial
evidence. <u>See</u> <u>Earl v. Nielsen Research, Inc.</u>, 658 F.3d 1108, 1113

(9th Cir. 2011). "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." Vasquez, 349 F.3d at 642.

## 2. Application

### a. Prima Facie Case

Leidos agrees that the first two elements of Plaintiff's prima facie case are present here. (Mot. at 24.) Specifically, Leidos admits that (1) Plaintiff is a member of a protected class because she is married, and (2) she was qualified for her position.

Regarding the third element, Leidos asserts that the only adverse employment action Plaintiff suffered was her official termination on December 2, 2011. (Mot. at 34.) As discussed below, the Ninth Circuit "define[s] adverse employment broadly" and holds that "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." Ray v. Henderson, 217 F.3d 1234, 1240 & 1243 (9th Cir. 2000). Accordingly, the Ninth Circuit has found "that a wide array of disadvantageous changes in the workplace constitute adverse employment actions." Id. at 1240.

The Court finds that Plaintiff was subject to several adverse actions in addition to her official separation from employment with Leidos on December 2, 2011. First, Plaintiff's

removal from PRITEC was an adverse action because a reasonable employee would be deterred from engaging in protected conduct if the employee knew that it would result in their removal from a project in which they had been working on for several years. Second, Nirenberg's statement to Plaintiff that HR would begin the termination process is an adverse action because a reasonable employee would be dissuaded from engaging in protected conduct if the employee knew that their company would initiate the process of terminating their employment. Finally, Leidos' issuance of the Notice of Lay-off on November 4, 2011, was an adverse action because courts have consistently held that termination of employment constitutes an adverse employment action. See, e.g., Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).

Accordingly, the only remaining issue regarding Plaintiff's prima facie case is whether similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. Hawn, 615 F.3d at 1156.

The Ninth Circuit has held that individuals "are similarly situated to the plaintiff when they 'have similar jobs and display similar conduct.'" Earl, 658 F.3d at 1114 (quoting Vasquez, 349 F.3d at 641). Although Plaintiff need not show that other employees were identical to her, she must show that they

were "similar in material respects." Id. Materiality depends on the facts and circumstances of the case. Hawn, 615 F.3d at 1157. In other words, "[m]ateriality depends on the context and is a question of fact that cannot be mechanically resolved." Earl, 658 F.3d at 1114; see also Beck v. UFCW, Local 99, 506 F.3d 874, 885 n. 5 (9th Cir. 2007) (holding that "whether two employees are similarly situated is ordinarily a question of fact"). The Ninth Circuit has noted that "it is important not to lose sight of the common-sense aspect of the similarly situated inquiry. . . It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees." Earl, 658 F.3d at 1115. (internal quotations omitted).

Here, Plaintiff points to four sets of related, non-married employees who were subject to SH-2 assessments around the same time as the Wigents' 2011 assessment. (Opp. at 19-22.) Plaintiff asserts that these non-married relatives had what could be considered an "indirect supervisory" or "direct supervisory" relationship but were not penalized by Leidos under SH-2. (Id. at 19.) As it did with the Wigents, Leidos prepared assessment reports discussing whether these non-married relatives' working relationships violated SH-2. (See Pl.'s CSF Ex. L.)

First, on July 9, 2011, Leidos assessed whether the working relationship between Scott Smith and his son, James Smith, violated SH-2. (Id. at 1-2.) Leidos stated in the

Background section that Scott is a Program Manager in Division 212, and James is an Engineering Intern in Division 346. (Id. at 1.) In the same section, Leidos stated that "James does not presently perform work on programs managed by Scott." (Id.) Proceeding to the Indirect Supervision Discussion section, Leidos noted that "[a]lthough Scott has program management, profit and loss, or budgetary responsibilities within his programs, James does not report to Scott nor does he perform work on the programs that Scott manages." (Id. at 2.) Leidos further noted that "if James' specific skill set is required on a task under any program that Scott manages, those tasks will be managed by [another Program Manager]." (Pl.'s CSF Ex. L at 2.) Accordingly, Leidos concluded that there were no direct or indirect supervision issues regarding the SH-2 policy that were applicable to the Smiths' working relationship. (Id.)

Next, on July 19, 2011, Leidos conducted an assessment of whether the working relationship between Amy Smith and her son, Sean Smith, violated SH-2. (Id. at 3-4.) In the Direct Supervision Discussion, Leidos stated that "Amy Smith is a branch (line) manager in the Ocean Sciences Research and Development Division (335 rate pool)," and "Sean, while working within Amy's overall chain, is not" supervised by his mother. (Id. at 3.) The Indirect Supervision Discussion stated that Amy "has program management, profit and loss, and budgetary responsibilities for

-37-

her projects," but has no influence over the profit and loss or budgetary responsibilities of her son's prospective project. (Id. at 3.)[12/] As such, Leidos concluded that there were no direct or indirect supervision issues that were applicable to the Smiths' working relationship. (Pl.'s CSF Ex. L at 4.)

Third, Leidos' report of June 28, 2011, assessed whether the working relationship between Susan Harris and her son, Zachary Harris, violated SH-2. (Id. at 5-6.) In the Direct Supervision Discussion, Leidos stated that "Susan Harris is a line manager (program manager) but will not be the line manager on Zachary Harris's project and will not be his supervisor." (Id. at 5.) In the Indirect Supervision Discussion, Leidos further stated that "Susan Harris has program management, profit and loss, and budgetary responsibility for her projects" but "has no supervisory responsibility over the profit and loss or budgetary performance of" Zachary's prospective project. (Id. at 5-6.) Importantly, however, the assessment report noted that Zachary was assigned to the "Cedar" project which fell under the "Timber" contract. (Id. at 6.) Susan was the PM for the Timber contract.

---

[12/]The Court notes that, in the beginning of the report, Leidos struck out the names "Susan Harris and Zak Harris" and replaced them with "Amy Smith and Sean Smith." (Id.) The Court further notes that the Indirect Supervision Discussion appears to incorrectly refer to "Zak Harris" rather than "Sean Smith." (See Pl.'s CSF Ex. L at 3.) Because the Court must view the facts and draw reasonable inferences in the light most favorable to Plaintiff, the Court regards the report (for purposes of this Motion) as referring to Sean Smith, and not Zak Harris.

(Pl.'s CSF Ex. L at 6.) As PM on the Timber contract, Susan was "to act as the liaison to the government COR for issues pertaining to the contract and programmatic planning activity" and did not have "cost, schedule and technical performance" oversight. (Id.) Because the individual PMs were responsible for these tasks, the report concluded that there were no direct or indirect supervision issues regarding SH-2 that were applicable to the Harris' working relationship. (Id.)

Finally, on August 26, 2011, Leidos conducted an assessment of whether the working relationship between Daniel Kilfoyle and his nephew, Alex Kilfoyle, violated SH-2. (Id. at 7-8.) The Direct Supervision Discussion of the assessment report provides in relevant part:

> Neither Dan nor Alex is a line manager.
> Although they report through the same cost
> center division, they do so through separate
> organizational structures and reporting
> lines. . . .
>
> In Dan's capacity as senior technical staff,
> he provides technical leadership on programs
> across the EW division. As such, in past
> tasks under the Retriever Program in 2010,
> Dan provided technical leadership and
> direction to engineers assigned to the
> program, including Alex.

(Id.) Leidos further noted in the Indirect Supervision Discussion that neither Daniel nor Alex had "program management[,] profit and loss, or budgetary responsibility within EW division, Cost Center 1758, or anywhere else in SAIC." (Pl.'s CSF Ex. L at 8.)

-39-

Like in previous reports, Leidos concluded that there were no direct or indirect supervision issues regarding SH-2 that were applicable to the Kilfoyles' working relationship. (Id.)

Leidos argues that "none of the employees with whom Plaintiff seeks to compare herself were 'similarly situated.'" (Reply at 5.) (emphasis in original.) Specifically, Leidos contends that "[u]nlike the Wigents, none of the four employees with whom Plaintiff compares herself were assigned to the very project where their employee-relative was the Project Manager." (Id. at 6.)

The Court agrees with Leidos that James Smith and his mother are not "similarly situated" to Plaintiff and her husband. However, the Court finds that, viewing the evidence in the light most favorable to her, Plaintiff meets her minimal prima facie burden by demonstrating that a genuine issue of material fact exists as to whether three other sets of similarly situated individuals outside her protected class were treated more favorably than her and her husband. See Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 659 (9th Cir. 2002) ("The requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."); Sischo-Nownejad v. Merced Cmty. College Dist., 934 F.2d 1104, 1110-11 (9th Cir. 1991) ("[T]he amount [of evidence]

that must be produced in order to create a prima facie case is very little.") (quotation marks omitted).

In particular, Plaintiff points out that Leidos concluded that there were no direct or indirect supervision issues regarding Amy and Sean Smith's working relationship, even though Sean was "working within Amy's overall chain." (Pl.'s CSF Ex. L at 3.) Leidos in its Reply asserts that Amy was not the PM on the project to which Sean was assigned. (Reply at 6.) The assessment report describes Amy as a "branch (line) manager." (Id. at 3.) However, in the Direct Supervision Discussion of the Harris' assessment report, Leidos appears to describe a "line manager" as a "program manager." (See id. at 5.) It is thus unclear to the Court the extent to which a "branch (line) manager" differs from a "Project Manager." Viewing the facts in the light most favorable to Plaintiff, the Court finds that Sean was working under Amy's organizational structure; and Amy had substantial managerial responsibilities within that structure.

As discussed above, Leidos also found that Susan and Zachary Harris' working relationship did not violate SH-2 even though Zachary was working on the Cedar project which "fell under" the Timber contract, where Susan was PM. (Id. at 6.) Leidos contends that Susan and Zachary Harris are not similarly situated to the Wigents because Susan's role as PM was limited to that of a government liaison and thus did not have cost,

schedule, or technical performance oversight of the program her
son was assigned to. (Reply at 7.) However, drawing the facts in
the light most favorable to Plaintiff, the structural separation
between Susan and Zachary does not appear materially different
from the separation between Plaintiff and her husband. Plaintiff
submits evidence that her role on PRITEC was limited to that of a
consultant, and she was in a separate reporting and supervisory
chain from her husband.

The degree of separation between the Wigents and the
Kilfoyles is also similar in this respect. Like the Wigents,
Daniel and Alex Kilfoyle were in "separate organizational
structures and reporting lines." (Pl.'s CSF Ex. L at 7.)
Furthermore, the Wigents were in completely different divisions
arguably creating an even greater degree of organizational
separation than the Kilfoyles' working relationship.

Again, taking the evidence as a whole, the Court
finds that Plaintiff meets her minimal prima facie burden by
demonstrating that a triable issue of material fact exists as to
whether Amy and Sean Smith, Susan and Zachary Harris, and Daniel
and Alex Kilfoyle were similarly situated individuals outside
Plaintiff's protected class and were treated more favorably than
her and her husband. In so finding, the Court rejects Leidos
attempts to impose a strict construction of the "similarly
situated" requirement and force Plaintiff to produce evidence of

non-relatives employees who were in an identical employment situation to the Wigents. See Earl, 658 F.3d at 1114 (holding that the similarly situated inquiry does not require a "one-to-one mapping between employees"). The Ninth Circuit only requires that similarly situated individuals be "similar in all material respects." Id. at 1114 (emphasis added). "Material" means "[h]aving some logical connection with the consequential facts." Black's Law Dictionary, 8th Ed. p. 998 (2004). Plaintiff met her minimal prima facie burden by submitting evidence of non-married Leidos employees with some managerial or leadership responsibilities over a program or project that their relatives work on.

Even assuming (but not finding) that none of the four employees with whom Plaintiff compares herself were similarly situated, the Ninth Circuit holds that the fourth element of Plaintiff's prima facie case can be met by showing that "similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." Hawn, 615 F.3d at 1156 (emphasis added). As indicated hereinbefore, the Court concludes that Leidos' application of SH-2 to the Wigents in 2011 and Leidos' finding a violation of the policy raises a genuine issue of material fact whether they constitute circumstantial evidence that SH-2 was

applied in a discriminatory manner.

Accordingly, the Court finds that Plaintiff establishes the fourth and final element of her prima facie case under either of <u>Hawn</u>'s alternative requirements.

### b. Defendant's Legitimate, Nondiscriminatory Reasons

Since Plaintiff has established a prima facie case of marital status discrimination, the burden now shifts to Leidos to show that its adverse employment actions were taken for legitimate, nondiscriminatory reasons. <u>Id.</u> at 1155.

Leidos submits that Plaintiff was removed from PRITEC on April 5, 2011, because the Wigents' working relationship violated SH-2; and Mark declined to step down as PM on the project. Further, Leidos submits that Plaintiff's employment was terminated because she turned down a part-time offer and did not contact HR for help with redeployment; and the company could not find her any other available position.

Accordingly, the burden now shifts back to Plaintiff to raise "a triable issue of material fact" as to whether Leidos' proffered reasons for its employment actions are "mere pretext for unlawful discrimination." <u>Hawn</u>, 615 F.3d at 1155.

### c. Evidence of Pretext

Plaintiff must establish that Leidos' reasons for its employment actions are pretextual by either directly persuading the Court that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered
explanation is unworthy of credence. Vasquez, 349 F.3d at 641.
Plaintiff attempts to show pretext by arguing that Leidos (1)
deviated from company protocols; (2) gave false explanations for
its employment actions; and (3) "applied policy SH-2 in a
discriminatory manner in 2011 after finding no conflict of
interest in 2004-2005, 2008, and 2009 under the same work
structure it had established for Plaintiff and Mark Wigent."
(Opp. at 5, 12, and 15.)

First, Plaintiff attempts to show pretext by asserting
that Leidos failed to follow its protocols in (1) placing
employees on the redeployment list upon removal from a program
and (2) continuing to employ engineers despite lacking "coverage"
for them. (Id. at 16.) The Ninth Circuit has found that
deviations from an employer's protocols may support an inference
of pretext. See Porter v. California Dep't of Corrections, 419
F.3d 885, 896 (9th Cir. 2004).

Here, Plaintiff submits in her declaration that during
the March 28, 2011 teleconference meeting Nirenberg (Plaintiff's
supervisor) and Jim Murray (VP of HR) told her that she would be
removed from PRITEC and "immediately" placed on the redeployment
list, but was not actually placed on the list until after she
received her November 4, 2011 termination notice. (Decl. of Pl. ¶
39, 43, 56.) At the April 21, 2014 hearing, Leidos conceded that

the company should have placed Plaintiff on the redeployment list
following her removal from PRITEC:

> THE COURT: You do agree when an employee goes
> under no coverage they are meant to be put on
> the redeployment list.
>
> MS. ING [Counsel for Leidos]: Yes, but the
> other side to that is that the employee needs
> to contact HR.

(Rough Transcript at 46.) Although Leidos argues that Plaintiff
needed to contact HR in order to get placed on the redeployment
list, the record indicates that HR was aware that Plaintiff was
"without coverage." (See Def.'s CSF Ex. 9.) Specifically, the
record shows that Alicia Larosa-Lowe (Senior HR Generalist) was a
participant in the March 28, 2011 teleconference meeting in which
Leidos decided to remove Plaintiff from PRITEC and attempt to
redeploy her. (Id.)

Leidos argues that the only evidence Plaintiff submits
in support of her claim that the company failed to follow its
protocols are "self-serving, conclusory statements." (Reply at
12.) The Court observes that much of Plaintiff's evidence is
derived from her declaration and deposition testimony. The Ninth
Circuit has held that "[s]pecific testimony by a single declarant
can create a triable issue of fact," but that a court "need not
find a genuine issue of fact if, in its determination, the
particular declaration was 'uncorroborated and self-serving.'"
Neovi, 604 F.3d at 1159 (citing Villiarimo, 281 F.3d at 1061).

However, as discussed above, the Ninth Circuit in <u>Phan</u> court held that self-serving declarations can create a genuine issue of material fact; and that courts can only disregard a self-serving declaration in certain instances, such as when the declaration is conclusory or is based on facts beyond the declarant's personal knowledge. <u>Phan</u>, 500 F.3d 895, 909-10.

Here, the Court finds Plaintiff's statement in her declaration that other engineers continued to be employed despite losing "coverage" creates a triable issue of material fact as to whether Leidos failed to follow its protocols. (<u>See</u> Decl. of Pl. ¶¶ 53, 61.) During her deposition, Plaintiff provided the names of two engineers on Kauai and Maui who remained employed despite losing coverage. (Pl.'s CSF Ex. B at 206.) Although Plaintiff could not provide the names of other Leidos employees who remained employed despite losing coverage, she described which division these employees worked in and their current employment status. (<u>Id.</u> at 207.) Accordingly, the Court finds that Plaintiff's statement creates a triable issue of material fact because she provides detailed facts in support of her statement; and the statement is based on her personal knowledge. <u>See</u> <u>Phan</u>, 500 F.3d at 909-10.

The Court also finds that Plaintiff's statement that Leidos failed to place her on the redeployment list following her removal from PRITEC on April 5, 2011, creates a triable issue of

material fact as to whether the company failed to follow its protocols. As indicated above, Leidos admitted at the April 21 hearing that Plaintiff should have been placed on the redeployment list following her removal from PRITEC, but was only placed on the list after the company issued her the layoff notice on November 4, 2011.

Plaintiff also attempts to show pretext by asserting that Defendant, through Brian Liss (Senior Counsel for Leidos), made false statements to the Hawaii Civil Rights Commission regarding the company's reasons for removing Plaintiff from PRITEC and misrepresented her employment status to the HCRC. (Opp. at 13-15.)

On November 3, 2011, Liss sent a position statement letter to the HCRC in response to Plaintiff's Charge of Discrimination. (Pl.'s CSF Ex. C.) Three months later, on February 16, 2012, Liss sent another position statement letter to the HCRC in response to Plaintiff's Amended Charge of Discrimination. (Pl.'s CSF Ex. E.) In both these letters, Liss stated that "SAIC concluded that Mr. Wigent exercised direct and indirect supervision over his wife." (Pl.'s CSF Exs. C & E.) However, the Wigents' 2011 assessment report concluded "that there is a violation of SH-2 in the area of indirect supervision and potentially in the area of direct supervision." (Def.'s CSF Ex. 7) (emphasis added); (see also Pl.'s CSF Ex. F) (HR document

-48-

indicating that Plaintiff was removed from PRITEC because "there was a violation of [SH-2] in the area of indirect supervision".)

Leidos argues that Liss' statement was not false because he "quoted directly" from the 2011 SH-2 assessment report. (Reply at 11.) However, Liss did not quote directly from the 2011 assessment report; if he had quoted directly from the report, he would have included the critical word "potentially" when he stated that Leidos exercised direct supervision over his wife. (Def.'s CSF Ex. 7.) Moreover, Liss had an additional opportunity, three months after he filed his original position statement, to modify the letter and notify the HCRC that Leidos only found a potential violation of SH-2 in the area of direct supervision. (See Pl.'s CSF Ex. E.) However, Leidos' position statement letter (dated February 16, 2012) again provided that Mark "exercised direct and indirect supervision over his wife." (Id.)[13]

The Court observes that in Liss' November 3, 2011 and February 16, 2012 letters to the HCRC - immediately following his assertion that Mark "exercised direct and indirect supervision over his wife" - he quoted the full direct

_____

[13]Leidos argued at the April 21 hearing that Liss did not make a false statement regarding the content of the 2011 assessment report because the agency "had that information before it." (Rough Transcript at 24.) The record indicates that Liss attached the report to a separate letter also sent to the HCRC on November 3, 2011. (See Pl.'s CSF Ex. D.)

supervision discussion of the 2011 assessment report.[14/]

Specifically, Liss stated that

> [r]egarding direct supervision, SAIC
> concluded that 'although Mark's
> responsibilities do not include conducting
> [Plaintiff's] performance or salary reviews,
> approving her timecards or expense reports,
> he does manage the overall work of the
> program, he <u>may</u> be assigning work to Shannon
> and he <u>may</u> affect [Plaintiff's] employment if
> there was a funding reduction on the
> program.'

(<u>Id.</u>) (emphasis added.)

Notwithstanding his quoting of the full direct

supervision discussion, a genuine issue of material fact exists

as to whether Liss' failure to notify the HCRC that Leidos only

found a potential SH-2 violation in the area of direct

supervision indicates that the company was "dissembling to cover

up a discriminatory purpose." <u>Reeves v. Sanderson Plumbing</u>

<u>Products, Inc.</u>, 530 U.S. 133, 147 (2000). Indeed, Liss should be

expected to have included such critical information because he

was writing directly to a government agency responsible for

investigating employment discrimination complaints in the state

of Hawaii. <u>See</u> H.R.S. § 368-3 (listing powers and functions of

---

[14/]In the November 3, 2011 and February 16, 2012 position
statements letters, Liss quoted the full direct supervision
discussion of the 2011 assessment report, but omitted the
following language from the Indirect Supervision Discussion: "In
previous SH-2 assessments, Shannon was working under TENA and not
exclusively under PRITEC. The policy lists 'program management'
as an indirect supervision area." (<u>See</u> Pl.'s CSF Exs. C & E.)

HCRC); H.R.S. § 368-11(a) (granting jurisdiction to HCRC to investigate complaints of unlawful discrimination).

On the other hand, Leidos may argue that the word "may" used twice in the direct supervision discussion would alert the reader that it involved a "potential" conclusion; and, further, that the entire report also was forwarded by a separate letter on November 3, 2011, so the full language of the report was available to the HCRC.

Plaintiff also asserts that Liss made misleading statements regarding her employment status in the company's supplemental response letter to Plaintiff's Charge of Discrimination, dated November 3, 2011. (Pl.'s CSF Ex. D.) In the supplemental response letter, Liss stated that

> Ms. Wigent's current employment status is
> under review. This review is not yet
> concluded, nor has Ms. Wigent received a
> formal layoff notice at this point. If no
> other work is identified for Ms. Wigent, then
> SAIC will issue Ms. Wigent a layoff notice.

> SAIC has not yet laid off Ms. Wigent. . . .

(Id.) The Court finds that a reasonable juror could determine that Liss misrepresented to the HCRC that Leidos, as of November 3, 2011, was still "reviewing" Plaintiff's status and had "not yet laid [her] off," even though the decision had already been made to terminate her employment with Leidos. Plaintiff provides several emails, all dated November 1, 2011, indicating that the decision to layoff Plaintiff was made prior to November 3rd, and

that Liss on November 1st specifically authorized the decision. (See Pl.'s CSF Ex. G.) Although he suggests that Leidos was still attempting to find "other work" for Plaintiff, the November 1 email indicates that Liss knew the company was going to issue her a layoff notice.

Leidos argues that Liss did not misrepresent Plaintiff's employment status because the layoff notice had not been issued. (Reply at 11.) Although the Court agrees with Leidos that the effective date of the layoff notice was November 4, 2014, a trier of fact could reasonably interpret Liss' statement as suggesting that Leidos was still deliberating whether or not to layoff Plaintiff. As stated above, Plaintiff submits evidence that Liss previously authorized the Notice of Lay-off on November 1 and thus was fully aware when he wrote the November 3, 2011 letter to the HCRC that Leidos would issue her a layoff notice. Because Liss sent the letter on November 3, a mere one day before the effective day of the layoff notice, being November 4, Liss' suggestion that Leidos was still reviewing Plaintiff's status is highly questionable.

Leidos further argues that Plaintiff's future employment status was still undetermined because the layoff notice provided her with two options prior to her final termination. (Reply at 11.) Plaintiff was given the option to terminate her employment on December 2, 2011, or take leave

without pay until December 30, 2011. (Pl.'s Dep. Ex. 15.) The latter option allowed Plaintiff to "identify alternative coverage" within Leidos. (Id.) Nevertheless, viewing all inferences in favor of Plaintiff, a trier of fact could conclude that it was questionable as to whether Plaintiff could have actually acquired another position after Leidos issued her the Notice of Lay-Off. Consequently, a genuine issue of material fact exists as to whether Liss' statements in his supplemental response, dated November 3, 2011, were misleading and demonstrate that Leidos was "dissembling to cover up a discriminatory purpose." Reeves, 350 U.S. at 147.

Finally, Plaintiff argues that Leidos' reasons for finding in 2011 that the Wigents' working relationship violated SH-2 are "unworthy of credence" because the company found no SH-2 violation in three previous assessments (2005, 2008, and 2009), even though Plaintiff and her husband were under the same work structure. (Opp. at 5-12.) As discussed in Part I(B) of the Discussion section of this Order supra, the 2011 assessment report stated that, in previous SH-2 assessments, Plaintiff was not working "exclusively" on projects where her husband was PM. Moreover, Leidos admits that "from 2008 to her removal from the PRITEC contract in 2011, Plaintiff charged 90 - 100% of her time to projects in which Mark Wigent was the Project Manager." (Pl.'s CSF Ex. H No. 7.) Accordingly, a reasonable juror could find that

Leidos' explanation is pretextual because Plaintiff was spending at a minimum ninety percent, and potentially up to one hundred percent, of her time on her husband's PRITEC project when Leidos conducted the 2008 and 2009 assessments, and yet the company found no SH-2 violation at that time. In other words, Leidos' failure to apply SH-2 consistently with past assessments could lead a trier of fact to conclude that its explanation for finding a SH-2 violation in 2011 is pretextual. See Chuang, 225 F.3d at 1127 (finding that a plaintiff may prove pretext "by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent").

In addition to the explanation presented in the 2011 assessment report, Leidos offers another reason for its finding that the Wigents' working relationship violated SH-2, though prior assessments found no such violations. According to Leidos, the 2011 SH-2 assessment was "completed by HR, and HR alone" whereas the 2005 assessment was done with the assistance of the Wigents, and the 2008 and 2009 assessments were prepared by Mudrak (Plaintiff's supervisor). (Reply at 9-10.) Although Leidos contends that the 2011 assessment was completed by HR alone, the assessment report indicates that it was authored by Ed Foreman (Mark's supervisor) and Sergio Nirenberg (Plaintiff's supervisor), as well as Jim Murray (VP of HR). Moreover, as Leidos admitted at the April 21 hearing, each prior assessment

-54-

report was approved by HR. (Rough Transcript at 8.)[15/] Viewing all inferences in favor of Plaintiff, a fact-finder could thus conclude that HR was actively involved in reviewing, and had some input, into all prior SH-2 assessments.

Leidos further argues that HR made an "unbiased determination" of Plaintiff and her husband's working relationship and notes that the Wigents admitted during their depositions that "HR had no bias against them." (Reply at 10 n. 4.) However, Leidos does not argue that Mudrak's 2008 and 2009 assessments were biased or otherwise not conducted objectively. As such, a reasonable juror could determine that Leidos' explanation that the results of the 2011 assessment report deviated from three prior assessments because "HR alone" conducted it is unworthy of credence.[16/]

_____

[15/]Leidos further admits that the 2005 assessment was conducted, in part, by Marjorie Bailey (Leidos' VP of HR). (Decl. of Murray ¶ 13.)

[16/]Leidos argues that its determination that the Wigents' working relationship violated SH-2 was based on Mark including Plaintiff on a staffing plan for PRITEC. (Mot. at 31.) However, Plaintiff asserts that her name had been placed on the staffing plan, or "EQDR" proposal, to merely represent the need in a budget for a systems engineer, and that the placement of her name did not mean she would be assigned any work on the project. Consequently, a genuine issue of material fact exists over whether the EQDR proposal would actually modify the Wigents' work structure sufficient to warrant a finding that Plaintiff and her husband's working relationship violated SH-2. Even assuming (but not finding) the EQDR proposal would modify the Wigents' work structure, Leidos does not explain why it could not re-structure the Wigents' working relationship to avoid a SH-2 violation, as it had previously done in 2005. The [continued on next page]

Taking the evidence as a whole, the Court finds that a genuine issue of material fact exists as to whether Leidos' proffered reasons for finding a violation of the Wigents' working relationship and removing Plaintiff from PRITEC are pretextual. See Reeves, 530 U.S. at 148.

Accordingly, the Court finds that Plaintiff has created a triable issue of material fact concerning discrimination under the McDonnell Douglas burden-shifting framework and, therefore, DENIES Defendant's Motion for Summary Judgment with respect to Plaintiff's H.R.S. § 378-2(1) marital status discrimination claim.

## II. Plaintiff's H.R.S. § 378-2(2) Retaliation Claims

### A. Statutory Framework

Plaintiff also brings several retaliation claims under H.R.S. § 378-2(2). (Compl. ¶¶ 37-40, 42-46.) H.R.S. § 378-2 provides in relevant part:

> (a) It shall be an unlawful discriminatory practice:
>
> . . .
>
> (2) For any employer. . . to discharge, expel, or otherwise discriminate against any

---

Court also notes that Mark's submission of the EQDR proposal appeared to merely trigger the investigation into the Wigents' working relationship, and did not form the actual basis for Leidos finding a SH-2 violation. Finally, Plaintiff submits in her declaration that the amount of work allocated to the systems engineer on the EQDR proposal represented only five percent of the total budget.

individual because the individual has opposed
any practice forbidden by this part or has
filed a complaint, testified, or assisted in
any proceeding respecting the discriminatory
practices prohibited under this part[.]

Adopting the McDonnell Douglas burden-shifting
analysis, the Hawaii Supreme Court has held that a "retaliation
claim under H.R.S. § 378-2(2) is subject to the following three-
part test." Schefke, 96 Haw. at 426. First, Plaintiff must
establish a prima facie case of retaliation by showing that (1)
she engaged in a protected activity; (2) her employer subjected
her to an adverse employment action; and (3) a causal link exists
between the protected activity and the adverse action. Id.; see
also Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000)
(applying the same three elements for establishing a prima facie
case of retaliation under Title VII, which is analogous to H.R.S.
§ 378-2(2)). If Plaintiff "establishes a prima facie case of
retaliation, the burden shifts to [Defendant] to provide a
legitimate, nondiscriminatory reason for the adverse employment
action." Schefke, 96 Haw. at 426 (citing Ray, 217 F.3d at 1240;
Shoppe, 94 Haw. at 377). If Defendant "articulates such a reason,
the burden shifts back to [Plaintiff] to show evidence
demonstrating that the reason given by [Defendant] is
pretextual." Id.

**B. Application**

**1. January and February 2011 Complaints**

Plaintiff's first retaliation claim arises from alleged
instances of protected activity occurring in January and February
2011. Specifically, Plaintiff asserts that she and her husband
complained to HR in January 2011 after Foreman suggested that
Leidos investigate her work relationship with Mark. (Opp. at 32.)
Plaintiff further asserts that, in response to her and her
husband's January 2011 complaints, Foreman told Mark that he
likes to "hit hard" and that Plaintiff would "never work again in
Hawaii." (Opp. at 32.) The record appears to indicate that
Foreman's comments led Mark to file an ethics complaint against
him. (See Pl.'s CSF Ex. K.) Plaintiff further asserts that she
complained to HR about unfair treatment in February 2011. (Opp.
at 32.) According to Plaintiff, she and her husband's January and
February 2011 complaints resulted in Mark receiving an
"unsatisfactory/not meeting expectations" performance review and
no pay raise in connection with that review. (Opp. at 32.)[17]

---

[17]Plaintiff argues that the alleged retaliation against Mark
is actionable by her, pursuant to the U.S. Supreme Court's
decision in Thompson v. North American Stainless, LP, 131 S. Ct.
863 (2011). In Thompson, the Court rejected a categorical rule
that third-party reprisals do not violate Title VII and held that
an employer's alleged act of firing an employee in retaliation
against the employee's fiancee who engaged in protected activity,
if proven, constituted unlawful retaliation. Thompson, 131 S. Ct.
at 867-68. Under Thompson, Plaintiff has standing to sue for any
retaliatory acts committed against her because of her husband's
protected activity. See id. at 868. However, it is unclear if
Plaintiff has standing to sue for retaliatory acts taken against
her husband since he is not a party to this case. The only
adverse action taken against Mark appears to be the negative
performance review and his lack of pay [continued on next page]

Plaintiff also appears to argue that the January and February 2011 complaints led Leidos to remove her from PRITEC. (Pl.'s Dep. Ex. 12 at No. 3.)

Leidos asserts that Plaintiff's Complaint does not contain any of the above allegations. (Reply at 13.) Leidos argues that these newly asserted allegations should be barred because they would prejudice Defendant, contradict Plaintiff's deposition testimony, and were not raised administratively. (<u>Id.</u> at 13-18.)

Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in a complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Swierkiewicz v. Sorema N.A.</u>, 543 U.S. 506, 512 (2002). Here, Plaintiff's Complaint does not allege that she or her husband engaged in protected conduct in January or February 2011. (<u>See</u> <u>generally</u> Compl.) Rather, her Complaint alleges that Plaintiff first engaged in protected activity "[o]n or around April 2011" and again in August 2011 when she informed Nirenberg "that she believed the Company's refusal to assign her to a project, including PRITEC, violated the law prohibiting marital

raise. As indicated below, the Court finds that Plaintiff's retaliation claim arising from alleged instances of protected activity occurring in January and February 2011 should be barred. Accordingly, the Court need not address the issue of whether Plaintiff has standing to sue for any retaliatory acts committed against Mark in response to the Wigents' January and February 2011 complaints.

status discrimination." (Id. ¶¶ 24, 26.) Both federal and Hawaii courts have barred plaintiffs from asserting new claims or theories at the summary judgment stage. See Trishan Air, Inc. v. Federal Ins. Co., 635 F.3d 422, 435 (9th Cir. 2011) (finding district court did not err in dismissing claim premised on specific provision of aviation insurance policy because it was not raised in plaintiff's complaint); Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963, 965-66 (9th Cir. 2006) (holding that the complaint "gave. . . no notice of the specific factual allegations presented for the first time in [plaintiff's] opposition to summary judgment"); Tokuhisa v. Cutter Mgmt. Co., 122 Haw. 181, 193 (Haw. Ct. App. 2009) ("Even construing. . . Plaintiffs' respective complaints liberally, we cannot say that the complaints included a UDAP claim besides the one alleging that Cutter marketed and sold insurance in the form of the VTR.") Allowing Plaintiff to assert retaliation claims arising from alleged instances of protected activity occurring in January or February 2011 would prejudice Leidos because her Complaint did not provide the company notice of such claims.

Next, as Leidos points out, Plaintiff's deposition testimony contradicts her allegations that she engaged in protected conduct in January and February 2011. Plaintiff admitted during her deposition that the first time she believed that Leidos was acting unlawfully was in April 2011, when she

spoke with Nirenberg to notify him that she was sending a letter through her attorney stating her removal from PRITEC was in violation of Hawaii antidiscrimination law. (Pl.'s Dep. 155:9-156:10.) Although she had discussions with Leidos' HR department in January and February 2011, Plaintiff did not state during her deposition that she told the company at these meetings that enforcement of SH-2 violated any federal or state antidiscrimination law or was otherwise unlawful. (See id. at 155:9-157:18.)

Finally, the Court concludes that Plaintiff was required to, but failed to, exhaust her administrative remedies. See French v. Hawaii Pizza Hut, Inc., 105 Haw. 462, 475-77 (Haw. 2004). In French, the Hawaii Supreme Court adopted the standard articulated by the Ninth Circuit in B.K.B. v. Maui Police Department, 276 F.3d 1091, 1100 (9th Cir. 2002) for analyzing whether a plaintiff has exhausted her administrative remedies. French, 105 Haw. at 476. The B.K.B. court held in relevant part:

> We construe the language of EEOC charges with utmost liberality since they are made by those unschooled in the technicalities of formal pleading. The crucial element of a charge of discrimination is the factual statement contained therein. Allegations of discrimination not included in the plaintiff's administrative charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge. In determining whether a plaintiff has exhausted allegations that she did not specify in her administrative charge, it is appropriate to

consider such factors as the alleged basis of
the discrimination, dates of discriminatory
acts specified within the charge,
perpetrators of discrimination named in the
charge, and any locations at which
discrimination is alleged to have occurred.

Id. (internal quotations and citations omitted). Here,

Plaintiff's Charge of Discrimination does not include any

allegations that she complained to Leidos in January or February

2011, or that those complaints led Foreman to threaten that

Plaintiff would never work again in Hawaii and give Mark a

negative performance review. (See Pl.'s CSF Ex. O.) Rather, the

factual statements in her Charge provide that the first time she

informed Leidos of her belief that the company was engaging in

discriminatory conduct was in April 2011. (Id.) Furthermore, the

Charge does not mention Foreman as a "perpetrator of

discrimination." (Id.)

For the foregoing reasons, the Court GRANTS Defendant's

Motion for Summary Judgment with respect to Plaintiff's

retaliation claim arising from alleged instances of protected

activity occurring in January and February 2011.

### 2. April 2011 Complaint and Letter

During the first week of April 2011, Plaintiff told her

division manager, Sergio Nirenberg, that Leidos was

discriminating against her based on her marital status. (Opp. at

25.) On April 20, 2011, Plaintiff sent a letter through her

attorney expressing her belief that Leidos was engaging in

unlawful marital status discrimination in violation of H.R.S. Chapter 378. (Pl.'s Dep. Ex. 10.) Plaintiff asserts that, in response to her April 2011 complaint to Nirenberg and April 20 letter, Leidos took steps to ensure Plaintiff would not be redeployed, including not placing her on the redeployment list.[18]

Leidos argues that Plaintiff cannot establish the second element of her prima facie case because the company's alleged "failure to find new work for her within Leidos meant that she remained on [] Leidos' payroll under 'overhead.'" (Mot. at 39.) According to Leidos, "being placed on 'overhead' is not an adverse employment action cognizable under the law." (Id.)

As discussed above, the Ninth Circuit "define[s] adverse employment action broadly." Ray, 217 F.3d at 1240. In Ray, the court held that "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." Id. Accordingly, the Ninth Circuit has found "that a wide array of disadvantageous changes in the workplace constitute adverse employment actions." Id. at 1240. "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a

---

[18]Plaintiff does not assert in her Complaint (or deposition or declaration) that during the March 28, 2011 teleconference meeting the Wigents raised any concerns that removing her from PRITEC would violate H.R.S. § 378-2's prohibition on marital status discrimination (or words to that effect). Thus, it appears that the Wigents did not engage in any protected activity during the March 28, 2011 meeting.

negative employment reference, issuance of an undeserved performance review and refusal to consider for promotion." <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 928 (9th Cir. 2000).

The parties agree that from April 5, 2011, to December 2, 2011, Plaintiff was placed on "overhead" and received the same salary and benefits as she had prior to removal from PRITEC. (Def.'s CSF at 8, ¶ 34; Pl.'s CSF at 2, ¶ 34.) However, the Ninth Circuit has found that even "a transfer to another job of the same pay and status may constitute an adverse employment action." <u>Ray</u>, 217 F.3d at 1241 (citing <u>St. John v. Employment Development Dept.</u>, 642 F.2d 273, 274 (9th Cir. 1981); <u>see also</u> <u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that "[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions'"). Even if an employee were to receive the same salary and benefits for an extended period of time, a reasonable employee would still be deterred from engaging in protected activity if the employee knew that it would cause their employer to take steps to ensure that the employee would not be redeployed.

Leidos also cites several decisions from the Ninth Circuit and other circuit courts of appeal in support of its argument that, as a matter of law, placing Plaintiff on "overhead" was not an adverse action. In <u>Fonseca v. Sysco Foods</u>, the Ninth Circuit "recognized that an adverse employment action

exists where an employer's action negatively affects its employee's compensation." 374 F.3d 840, 847 (9th Cir. 2004) (emphasis added). However, <u>Fonseca</u> did not address whether an adverse action exists where – as is the case here – an employer's action does <u>not</u> affect an employee's compensation (e.g., employee's salary remains the same).

Leidos also cites the Ninth Circuit's unpublished decision in <u>Jermy v. Jones</u>, 243 F.3d 548, at *1 (9th Cir. 2000); which referred to a quote in <u>Brooks v. City of San Mateo</u>, 214 F.3d 1082, 1093 (9th Cir. 2000), which stated "transferring an employee where salary is unaffected do[es] not constitute [an] adverse employment action[]." <u>Id.</u> (citing <u>Nidds v. Schindler Elevator Corp.</u>, 113 F.3d 912, 919 (9th Cir. 1996)). Neither <u>Jermy</u> nor <u>Brooks</u> involved a transfer where the employee's salary remained unaffected. Rather, the quoted language is based on the Ninth Circuit's <u>Nidds</u> decision. In <u>Nidds</u>, an elevator mechanic asserted that his removal from a service route and transfer to the restoration department was an adverse action, even though his compensation remained the same. <u>Nidds</u>, 113 F.3d at 915. While the <u>Nidds</u> court found that the mechanic's transfer was not an adverse employment action; the Ninth Circuit noted in a later case that <u>Nidds</u>

> conducted no analysis to reach this point,
> merely asserting that "Although we decline to
> view Nidds' transfer to the restoration
> department as an adverse employment action,

> his ultimate termination on July 28, 1992
> certainly was.'
>
> . . . <u>Nidds</u> [does not] establish that a
> lateral transfer can never be an adverse
> employment action. Had [it] done so, [it]
> would have had to abrogate this court's
> earlier decisions in <u>Yartzoff</u> and <u>St. John</u>. .
> . neither of which were cited in the. . .
> <u>Nidds</u> decision[].

<u>Ray</u>, 217 F.3d at 1241 n. 4 (internal citation omitted). Further,
the Court notes that the first <u>Brooks</u> decision was withdrawn and
superseded by <u>Brooks v. City of San Mateo</u>, 229 F.3d 917 (9th Cir.
2000). The second <u>Brooks</u> decision no longer referred to <u>Nidds</u> and
its ruling that the employee's transfer was not an adverse action
because his compensation remained the same. As such, Leidos'
reliance on <u>Jeremy</u> is misplaced.

Finally, the Second and Eighth Circuit decisions cited
by Leidos are distinguishable from the instant case because these
cases only addressed whether an employer's decision to place an
employee on administrative leave pending an investigation is an
adverse action. <u>Joseph v. Leavitt</u>, 465 F.3d 87, 91 (2nd Cir.
2006); <u>Singletary v. Missouri Dep't of Corrections</u>, 423 F.3d 886,
892 (8th Cir. 2005). In this case, Plaintiff was never placed on
"administrative leave," but rather removed from her position on
PRITEC. Moreover, there was no pending investigation into whether
Plaintiff and her husband's working relationship violated SH-2;
at the time Leidos removed her from PRITEC, the assessment of the
Wigents' working relationship was complete. Accordingly, the

Court finds that failing to redeploy Plaintiff was an adverse action.[19]

The Court also finds that a causal link exists between the April 2011 complaint and April 20, 2011 letter and Leidos' alleged decision to take steps to ensure Plaintiff would not be redeployed, including its failure to place her on the redeployment list. The Ninth Circuit has held that "causation may be established based on the timing of the relevant actions." Passantino v. Johnson & Johnson Prods., Inc., 212 F.3d 493, 507 (9th Cir. 2000). "Specifically, when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." Id. (citing Yartzoff, 809 F.2d at 1375-76 (finding causation based on timing of retaliation)); Miller v. Fairchild Industries, Inc., 885 F.2d 498, 505 (9th Cir. 1989) (holding that discharges forty-two and fifty-two days after plaintiffs engaged

---

[19]Leidos also argues that Plaintiff's allegation that Leidos refused to reassign her after she complained about discrimination in April 2011 is based on conclusory allegations; according to Leidos, Plaintiff offers no evidence in support of her allegations. (Mot. at 37.) The Court finds that there is a genuine issue of material fact as to whether Leidos was "actively looking for ways to keep Plaintiff employed with the company." (Id.) In particular, Plaintiff submits in her declaration that during the March 28, 2011 teleconference meeting Leidos told her that she would be placed on the redeployment list immediately. However, as discussed hereinbefore, Leidos conceded at the April 21 hearing that the company should have placed her on the redeployment list in April 2011 following her removal from PRITEC, but only placed her on the list after she received the Notice of Lay-off on November 4, 2011.

in protected activity were sufficient to establish prima facie case of causation). However, where the timing between the protected activity and the adverse employment action occurs after a sufficiently long period of time, courts have found there to be no causal link. See Clark County School Dist. V. Breeden, 532 U.S. 268, 273 (2001) (holding that a court may not infer causation from temporal proximity unless the time between an employer's knowledge of protected activity and an adverse employment action is "very close" in time and citing cases for the proposition that a three-month and four-month lapse is insufficient to infer causation).

Here, the temporal proximity between Plaintiff's April 2011 complaint to Nirenberg and April 20, 2011 letter and Leidos' failure to redeploy her is sufficient to infer causation. Specifically, Plaintiff asserts that shortly after she sent the April 2011 complaint, Nirenberg "asked [her] to look for a position outside of Hawaii." (Decl. of Pl. ¶ 44.) Further, and importantly, Leidos admits that Plaintiff should have been placed on the redeployment list following her April 2011 complaints of discrimination, but was only placed on the list from November 11, 2011, to November 29, 2011, and thus after the company issued her the Notice of Layoff. Moreover, the fact that Nirenberg and HR were aware of Plaintiff's allegations of discrimination bolsters a finding of causation. See Thomas v. City of Beaverton, 379 F.3d

802, 812 n. 4 (9th Cir. 2004) ("The employer's awareness of protected activity is also important in establishing a causal link.")

Leidos nevertheless argues that Plaintiff fails to establish her protected conduct was a "but-for" cause of the alleged adverse action, pursuant to the U.S. Supreme Court's recent opinion in <u>University of Texas Southwestern Medical Center v. Nassar</u>, 133 S. Ct. 2517, 2534 (2013). In <u>Nassar</u>, a physician of Middle Eastern descent alleged that a state university with which his hospital was affiliated revoked a job offer because he complained that he was racially and religiously harassed by a superior. <u>Id.</u> at 2524. The Supreme Court held his Title VII retaliation claim must be established under the traditional principles of "but-for" causation by showing that the unlawful retaliation would not have occurred in the absence of the alleged wrongful actions of his employer. <u>Id.</u> at 2533. The Court found that there was no but-for causation because the affiliation agreement between the hospital and the state university precluded defendant from even making the physician a job offer. <u>Id.</u> at 2532.

In this case, however, Plaintiff submits in her declaration that Leidos would have attempted to find her a new program or project if she did not make the April 2011 complaints of discrimination. In particular, Plaintiff states in her

declaration that other engineering jobs were available on Kauai,[20/] and that she would have been reassigned to them had she not complained of marital status discrimination. Furthermore, Leidos admits that Plaintiff should have been placed on the redeployment list in April 2011 following her removal from PRITEC, but was not placed on the list until after she received the Notice of Lay-Off on November 4, 2011. Accordingly, the Court finds that there is a genuine issue of material fact as to whether the "but-for" element has been satisfied.

Since Plaintiff has established a prima facie retaliation case, the burden shifts to Leidos "to provide a legitimate, nondiscriminatory reason for the adverse employment action." Schefke, 96 Haw. at 426. Here, Leidos submits that the company attempted to identify work for Plaintiff by, inter alia, contacting other program managers, but ultimately could not find her any work. Further, Leidos notes that Plaintiff admitted during her deposition that she did not approach HR to help her

---

[20/]Leidos objects to Plaintiff's statement that other engineering jobs were available on Kauai as being self-serving and uncorroborated. The Court finds that it can consider Plaintiff's statement because she provides detailed facts in support of her assertion, and her statement was based on personal knowledge. See Phan, 500 F.3d at 909-10. Specifically, Plaintiff submits in her declaration that several projects on Kauai - including "ANSS" and "NGRC" - had an opening for a systems engineer, and that she was qualified to perform the work. (Decl. of Pl. ¶¶ 64-65.)

with redeployment and did not apply to any positions through the company's website.

Consequently, "the burden shifts back to [Plaintiff] to show evidence demonstrating that the reason given by [Defendant] is pretextual." Schefke, 96 Haw. at 426. When considering the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact as to whether Leidos' reasons for not actively finding Plaintiff work are "unworthy of credence." See Vasquez, 349 F.3d at 641.

As discussed hereinbefore, Plaintiff offers sufficient evidence to raise a genuine issue of material fact about whether Leidos' reasons for not actively redeploying her were pretextual. Specifically, Plaintiff submits in her declaration that shortly after she sent the April 2011 complaint, Nirenberg told her "to look for a position outside of Hawaii." Next, Plaintiff puts forth evidence of the close temporal proximity between the April 2011 complaints and Leidos' adverse employment actions. See Bell v. Clackamas Cnty., 341 F.3d 858, 865 (9th Cir. 2003) ("Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases."). Finally, and importantly, Leidos admits that Plaintiff should have been placed on the redeployment list following her April 2011 removal from

PRITEC, but was only placed on the list after the company issued the Notice of Lay-Off on November 4, 2011.

Accordingly, the Court DENIES Defendant's Motion for Summary Judgment with respect to Plaintiff's retaliation claim that, in response to her April 2011 complaints of discrimination, Leidos took steps to ensure Plaintiff would not be redeployed.

### 3. August 3, 2011 Email

On August 3, 2011, Plaintiff sent an email to Nirenberg expressing her belief that the reason stated by Leidos for not allowing her to remain in her position was unlawful. (Def.'s CSF Ex. 14.) Plaintiff asserts that, in response, Nirenberg informed Plaintiff on August 4, 2011, that HR would begin the termination process. (Decl. of Pl. ¶ 48.) Plaintiff further asserts that Leidos ignored Mark's August 2011 offer to step down as PM.

Preliminarily, as previously discussed, the Court finds that Plaintiff's allegation that Leidos ignored Mark's August 2011 offer to step down as PM should not be considered because it was neither plead in the complaint nor raised administratively. Plaintiff's Complaint alleges that, as a result of her HCRC Charge, "the Company threatened both Plaintiff and her husband's job." (Compl. ¶ 25-26.) Plaintiff's Complaint further alleges that her "termination occurred shortly after she engaged in protected activity by filing a Charge of Discrimination with the Hawaii Civil Rights Commission" on September 24, 2011. (Id. ¶

40.) Consequently, the Complaint did not provide Leidos any
notice that Plaintiff was alleging that the company ignored or
rejected Mark's offer to step down as PM in retaliation for her
HCRC Charge. See Trishan Air, 635 F.3d at 435; Pickern, 457 F.3d
at 965-66.

Even construing Plaintiff's HCRC Charge with the
"utmost liberality," the Court also finds that Plaintiff failed
to exhaust her administrative remedies. See B.K.B., 276 F.3d at
1100. While she marked the box for "retaliation," Plaintiff's
HCRC Charge did not contain any factual allegations that Leidos
ignored or rejected Mark's offer to step down in August 2011.
Further, and importantly, the record indicates that Mark declined
two offers, in March 2011 and June 2011, by Leidos to step down
as PM in order to avoid a SH-2 violation. (Def.'s CSF Ex. 9 &
13.) However, when questioned about these events during her
deposition, Plaintiff did not once mention that Mark offered to
step down as PM in August 2011. Accordingly, the Court finds that
Plaintiff may not raise an allegation that Leidos disregarded her
husband's August 2011 offer to step down as PM.

Regarding the second element of her prima facie case,
Leidos argues that the only adverse employment action suffered by
Plaintiff was her official separation from Leidos on December 2,
2011. (Mot. at 34.) As discussed above, the Ninth Circuit
"define[s] adverse employment action broadly" and holds that "an

-73-

action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." <u>Ray</u>, 217 F.3d at 1243. Here, the Court finds that the decision to begin the layoff process on August 4, 2011, was an adverse action because a reasonable employee would likely be dissuaded from engaging in protected activity if they knew that their company would begin the process of terminating their employment. <u>See</u> <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006).

In addition to meeting the second element of her prima facie retaliation case, the Court finds that there is a causal link between Plaintiff's August 3, 2011 email to Nirenberg and Leidos' decision to begin the termination process on August 4, 2011. As noted above, a causal link can be inferred if the adverse employment decision is taken within a reasonable period of time after the complaint of discrimination has been made. <u>Passantino</u>, 212 F.3d at 507. Here, there is very close temporal proximity between the protected activity and retaliatory conduct: Leidos' decision to begin the termination process occurred a mere one day after Plaintiff complained of unlawful discrimination. In other words, Leidos' decision to initiate the layoff process "follow[ed] on the heels of protected activity." <u>Suzuki v. State</u>, 119 Haw. 288, 303 (Haw. Ct. App. 2008).

Moreover, pursuant to <u>Nassar</u>, the Court finds that there is a genuine issue of material fact as to whether there is but-for causation between the August 3 complaint and Leidos' decision to begin the termination process. As discussed above, Plaintiff submits in her declaration and deposition that other engineering position were available on Kauai, and that she would have been reassigned to one of those positions had she not complained of marital status discrimination. <u>See</u> <u>Nassar</u>, 133 S. Ct. at 2533. Further, Plaintiff states in her declaration that she would have been placed on the redeployment list before November 2011 had she not complained of marital status discrimination. <u>Id.</u>

Because Plaintiff has established a prima facie of retaliation, the burden shifts to Leidos "to provide a legitimate, nondiscriminatory reason for the adverse employment action." <u>Schefke</u>, 96 Haw. at 426. In this case, Leidos submits that Plaintiff rejected Nirenberg's offer to work part-time; and the company could not find her any other work. Further, Leidos notes that Plaintiff admitted during her deposition that she never contacted HR to help her with redeployment and did not apply to any positions through the company's website.

Consequently, "the burden shifts back to [Plaintiff] to show evidence demonstrating that the reason given by [Defendant] is pretextual." <u>Schefke</u>, 96 Haw. at 426. Here, Plaintiff submits

in her declaration and deposition that several engineering jobs
were available on Kauai. (Decl. of Pl. ¶¶ 63-65.) Further,
Plaintiffs states in her declaration that Nirenberg - other than
asking if she would be interested in working part-time - never
contacted her regarding specific and available work. (Id. ¶ 58.)
Also, Leidos admits that it should have placed Plaintiff on the
redeployment list following her April 2011 removal from PRITEC,
but that she was not placed on the redeployment list until after
the company issued her a layoff notice on November 4, 2011.
(Rough Transcript at 46; Decl. of Murray ¶ 26.)

As such, the Court finds that there is a genuine issue
of material fact as to whether there were any available
engineering positions available for Plaintiff on Kauai. Further,
and importantly, there is a triable issue of material fact as to
whether Leidos' reason for beginning the termination process was
pretextual because the company admits that it should have placed
Plaintiff on the redeployment list following her removal from
PRITEC, but only placed her on the list after she received her
layoff notice on November 4, 2011.

Accordingly, the Court DENIES Defendant's Motion for
Summary Judgment with respect to Plaintiff's retaliation claim
that, in response to her August 3, 2011 email to Nirenberg,
Leidos initiated the termination process.

### 4. September 24, 2011 HCRC Charge

Finally, Plaintiff asserts that, in response to her September 24, 2011 Charge of Discrimination with the HCRC, Leidos issued her a layoff notice on November 4, 2011. (Opp. at 31.)

The Court finds that Plaintiff establishes all three elements of her prima facie case. Again, Leidos argues that the only adverse employment action was her official separation from Leidos on December 2, 2011. (Mot. at 34.) However, as discussed above, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." Ray, 217 F.3d at 1243. Here, the Court finds that issuing Plaintiff the Notice of Layoff is an adverse action because a reasonable employee would be dissuaded from engaging in protected activity if the employee knew that their company would give them a layoff notice. See Burlington Northern, 548 U.S. at 68. The Court further finds that a causal link exists between Plaintiff's September 24, 2011 HCRC Charge and the November 4, 2011 Notice of Layoff. Here, the adverse action occurred roughly six weeks after Plaintiff filed the HCRC Charge and, therefore, the timing alone is sufficient to infer causation. Miller, 885 F.2d at 505 (holding that discharges forty-two and fifty-two days after plaintiffs engaged in protected activity were sufficient to infer causation).

Moreover, pursuant to Nassar, the Court finds that there is a genuine issue of material fact as to whether there is

but-for causation between the September 24 Charge and Leidos'
issuance of the layoff notice. As discussed above, Plaintiff
submits in her declaration and deposition that other engineering
positions were available on Kauai, and that she would have been
reassigned to one of those positions had she not complained of
marital status discrimination. <u>See</u> <u>Nassar</u>, 133 S. Ct. at 2533.
Further, Plaintiff states in her declaration that she would have
been placed on the redeployment list before November 2011 had she
not complained of marital status discrimination. <u>Id.</u> While Leidos
initiated the lay-off process on August 4, 2011, the Court notes
that Liss represented to the HCRC in his November 3, 2011 letter
to the agency that Plaintiff's employment status was still under
review.

Since Plaintiff has established a prima facie of
retaliation, the burden shifts to Leidos "to provide a
legitimate, nondiscriminatory reason for the adverse employment
action." <u>Schefke</u>, 96 Haw. at 426. Here, Leidos submits that the
company could not find any work for Plaintiff. Leidos further
notes that Plaintiff admitted during her deposition that she
never contacted HR to help her with redeployment and did not
apply to any positions through the company's website.

Consequently, "the burden shifts back to [Plaintiff] to
show evidence demonstrating that the reason given by [Defendant]
is pretextual." <u>Schefke</u>, 96 Haw. at 426. As indicated above,

the Court finds that there is a genuine issue of material fact as to whether there were any available engineering positions available for Plaintiff on Kauai. Further, and importantly, there is a triable issue of material fact as to whether Leidos' reason for issuing Plaintiff the layoff notice was pretextual because the company admitted that it should have placed her on the redeployment list in April 2011 following her removal from PRITEC, but that she was only placed on the list after she received the Notice of Lay-Off on November 4, 2011.

Accordingly, the Court DENIES Defendant's Motion for Summary Judgment with respect to Plaintiff's retaliation claim that, in response to her September 24, 2011 HCRC Charge, Leidos issued her a Notice of Layoff.

## CONCLUSION

For the foregoing reasons, the Court:

(1) GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment with respect to Plaintiff's H.R.S. § 378-2(1) claim; and

(2) GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment with respect to Plaintiff's H.R.S. § 378-2(2) claims.

IT IS SO ORDERED

DATED:  Honolulu, Hawaiʻi, May 8, 2014.



Alan C. Kay

Senior United States District Judge